# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JUSTIN R. BELISLE

            *Plaintiff,*

vs.

          Case No. 08-2087-EFM

BNSF RAILWAY COMPANY,

            *Defendant.*

## MEMORANDUM AND ORDER

On March 3, 2007, Plaintiff Justin R. Belisle was employed by Defendant BNSF Railway Company ("BNSF") as a brakeman for a train that was preparing to depart its Newton, Kansas yard. As part of his duties, Belisle was assigned the task of preparing the end of the train for departure, which included, among other tasks, the installation, arming, and testing of a turbine powered end-of-train device ("ETD"), which attaches to the last car on the train. The train on which Belisle was working was parked on one of two east-west main track lines located on the north side of BNSF's Newton yard ("Main 2"). The other main track line ("Main 1") was located north of Main 2. While working on or near the train on Main 2, a train approached on Main 1, passing the train on Main 2 at approximately 50 mph, striking Belisle as it passed.[1] As a result, Belisle suffered extensive injuries.

---

[1] The speed limit for trains traveling on these tracks is 50 miles per hour.

Belisle brought this action pursuant to the Federal Employer's Liability Act ("FELA"),[2] claiming that BNSF negligently failed in a number of ways to furnish and provide him with a reasonably safe place to work, reasonably safe methods for work, reasonably safe conditions for work, and reasonably safe appliances for work. BNSF denies all claims.

This matter came before the Court for hearing on March 25-26, 2010 on Belisle's Motion to Exclude William F. Kennedy and Brad C. Mathison (Doc. 264), and BNSF's Second Motion in Limine in which it seeks to exclude the testimony of Jimmy Scott (Doc. 144). Belisle appeared through counsel, Charles W. Gordon, Jr. and Christopher H. Leach of Hubbell, Peak, O'Neal, Napier & Leach. BNSF appeared through its corporate counsel James Roberts, and by William P. Coates, Jr. of Coates & Logan, LLC. Also before the Court post-hearing is BNSF's combined Motion to Redact Transcript of Deposition of Jimmy C. Scott and Motion to Modify the Court's Order of March 26, 2010 (Doc. 390).

## I. STANDARD

Opinions based on scientific, technical, or specialized knowledge are governed by Rule 702. Rule 702 provides that a witness who is qualified by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if, (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[3] A district court has broad discretion in

---

[2]45 U.S.C. § 51 *et seq.*

[3]Fed. R. Evid. 702.

deciding whether to admit expert testimony.[4]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[5] To determine whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court must determine "if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his discipline.' "[6] The Court must then inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[7] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation ... absolute certainty is not required."[8]

> The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability.[9]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of

---

[4]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citing *Orth v. Emerson Elec. Co., White-Rodgers Div.*, 980 F.2d 632, 637 (10th Cir. 1992)).

[5]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[6]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[7]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[8]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[9]*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004).

error; and (4) general acceptance in the scientific community.[10]  These factors may or may not be pertinent, depending on the nature of a particular issue, the expert's particular expertise, and the subject of the expert's testimony; however, the Court may consider these factors where they are a reasonable measure of reliability, which is a consideration the Court has broad latitude to determine.[11]

## II. ANALYSIS

### 1.  Belisle's Motion to Exclude the Opinion Testimony William Kennedy

BNSF has identified William Kennedy as its accident reconstruction expert.  Belisle does not dispute Kennedy's qualification as an expert witness in the field of accident reconstruction, and in fact, stipulated prior to Kennedy's testimony both that he was qualified by training, knowledge, and experience as an expert in the field of accident reconstruction, and that testimony from an accident reconstructionist would assist a jury in this case.  Rather, Belisle contends that the manner in which Kennedy reached his conclusions in this case was faulty and not in compliance with the generally accepted methods of accident reconstruction.  Therefore, Belisle argues that Kennedy's testimony must be excluded.  Because Kennedy's qualifications were not at issue, the Court only addressed the reliability of his methodology during the *Daubert* hearing.

In this case, Kennedy submitted his initial expert report on November 24, 2008.  Belisle argues that the report was erroneous because BNSF failed to provide Kennedy with an appropriate reference mark from the train's event data recorder (EDR) to plot the locomotive in space and time. Without this information, Kennedy chose to use the whistle board as the reference mark to plot the

---

[10]*Daubert*, 509 U.S. at 593-94.

[11]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).

train's position.  Belisle contends that Kennedy's assumption that the engineer started sounding the train's whistle at the whistle board was inconsistent with the EDR reference mark and deposition testimony, which ultimately, invalidates the conclusions reached in his report.

Belisle further claims that Kennedy's initial report was erroneous due to his use of two diagrams he received from BNSF.  Belisle asserts that these documents were prepared by two different people whose measurements depicting the end of Belisle's train on Main 2 of the accident scene were in conflict, leading to an improper determination of the point of impact (POI).  Thus, Belisle claims Kennedy failed to conduct a reliable analysis, invalidating the conclusions in his report.

Belisle claims that Kennedy attempted to correct the errors of his initial report in a second report, but an additional error caused his subsequent findings to be unreliable.  Belisle asserts that Kennedy made various mathematical errors in this report that become evident when comparing known distances to those distances appearing in Kennedy's second report.  Belisle contends that because of these mathematical errors, the Court must exclude Kennedy's second report.

Belisle contends that while Kennedy did not prepare a third report, he affirmed information in a supplemental report, which was created by BNSF's counsel to correct the errors contained within Kennedy's second report.  Belisle, however, claims that this third report also contains errors, causing the conclusions to once again be unreliable.  Belisle argues that rather than starting from scratch when the true stop position of the train was discovered, Kennedy used that information and simply adjusted his original analysis, which resulted in improper distances.  Belisle asserts that this process is inconsistent with generally accepted methods for accident reconstruction, and therefore, Kennedy's opinion should be excluded.

During his testimony, Kennedy acknowledged mistakes in is initial report, but stated that the methodology he used in reaching his conclusions was accepted in the scientific community. He testified that after his initial report, he received additional information that altered his opinion, such as the stop position identified on the rail, and used that position to tie in the information received from the train's event data recorder ("EDR") to identify the point in which the train's whistle began sounding. He further stated that he later corrected a mathematical error that resulted in a 9/10th of a second miscalculation, causing a 59-foot error in his analysis.

Belisle makes much argument over the POI location Kennedy used in his analysis, asserting that Officer George, a deputy with the Harvey County Sheriff's Department, provided a statement during discovery that the POI designation on his diagram did not represent the exact point where Belisle was struck. Instead, Belisle preferred that Officer George will now testify that his POI mark more appropriately denotes the end of the train on Main 2, and that he placed Belisle at this location based on information he received from other officers and witness statements. Kennedy, however, testified that his opinion is not for the purpose of establishing an exact POI, but instead, the thrust of his opinion is to establish the elapse of time from the point Belisle could have heard the train's whistle and the time the train struck him. Kennedy further stated that he placed Belisle at the POI location based on other witness testimony, along with the officer's report, as the last place Belisle was seen just prior to the incident.

The *Daubert* threshold is a gate keeper function that does not require the Court to find that an expert's opinion is based on certainty. Rather, this function only requires that the Court find a factual basis and a scientific basis for their opinion. Here, the purpose of Kennedy's opinion is not to establish an exact POI, but to establish the period of time between the point in which the train

began to sound its whistle and the time Belisle was struck by the train.  The fact that Kennedy may

not have started his analysis from scratch after receiving the EDR data or after receiving information

that the train moved prior to downloading that data is immaterial for this particular situation, as

Kennedy's calculations, albeit somewhat circular,  arrived at the same conclusions that would have

otherwise resulted.  It was also not unreasonable for Kennedy to rely on statements from witnesses

indicating that Belisle was not moving prior to being struck to place him at or near the location he

was last seen.  The Court concludes that there is an adequate factual basis for Kennedy to rely upon,

and the methodology he used, although perhaps not the most efficient or direct, still sufficiently

arrived at a point to give his opinion as to reaction time available.  Therefore, the Court will not

exclude Kennedy's opinion, and Belisle's motion is denied.

### 2. Belisle's Motion to Exclude the Opinion Testimony Brad C. Mathison

BNSF identified Brad Mathison as its expert hired to develop animations of BNSF's

perception of the accident.  Belisle's initial objection is that in creating these animations, Mathison

primarily relied on Kennedy's opinion to place the train in time and space, and because that opinion

was unreliable, the animations are unreliable and must be excluded.  Belisle's arguments focus

primarily on the inaccuracy of the POI relied upon by Kennedy, and asserts that no evidence

supports that reference.  Belisle also argues that those animations that do not depict the train that was

parked on Main 2 are inadmissible due to them being unduly misleading and prejudicial.  Belisle

suggests that having the train in the animations is important because the train on Main 2 created an

obstacle to Belisle's escape, and its absence from those animations misleads the jury into believing

Belisle had more escape options than were actually available.  In addition, Belisle contends there

is no factual basis for placing Belisle at a location beyond the end of the train, nor was there any

factual basis for having him face the train with his hands over his ears for upwards of twenty seconds. For these reasons, Belisle suggests the animations should be excluded.

Belisle also claims that the animation titled "Top View" is similarly misleading and confusing because radio conversations included in that animation are portrayed as taking place sequentially while in fact, they occurred simultaneously. In addition, Belisle suggests the conversations do not accurately reflect the time span in which those conversations took place (i.e., conversations on the animation take place over a shorter time period than those same conversations on the original dispatch tapes). Lastly, Belisle claims that the animation is not to scale, and moreover, depicts a moving yellow dot at the end of the video that is presumably meant to indicate Belisle's position on the track. Belisle contends that there is no factual basis for Belisle's positioning in the animation, and therefore, it misleads the jury. Because these animations are not reliable, Belisle contends they must be excluded.

BNSF reasserts its position that Kennedy's reconstruction analysis of the accident is reliable, and therefore, it provides sufficient basis for Mathison's animations. BNSF takes the position that the animations are not intended to recreate the scene, but instead, are simply intended to represent to a jury its own analysis of events leading up to the accident. BNSF contends that the animations are a fair and accurate representation of the evidence they are intended to present, and that Belisle can adequately address his concerns during cross-examination. Mathison testified that these animations were based on several pieces of information, such as event data recorder results, aerial photography, witness statements and other investigative reports, video he took at the scene, and Kennedy's data and conclusions. Mathison was unable to clarify the alleged discrepancy in the communication timeline of the Top View animation, and stated he would need to compare Belisle's

audio file with the one he was provided to determine the cause of the time difference. Mathison, however, testified that the methods he used in creating all animations were accepted and routinely used by experts in his field, and believes the animations reliably and accurately depict BNSF's theory in this case.

In reviewing an animation intended to be offered for demonstrative purposes, the Court is mindful that there exists a danger that a jury may "confuse art with reality," and that "the impressions generated by the evidence may prove particularly difficult to limit . . . ."[12] But in appropriate circumstances, the Court may permit such an animation to assist the jury in understanding a party's theory in a case.[13] As the Tenth Circuit recognized,

> [T]he difference [between recreating an accident and re-creating an expert's theory of the accident] is both real and significant; it is the difference between a jury believing that they are seeing a repeat of the actual event and a jury understanding that they are seeing an illustration of someone else's opinion of what happened. So long as that distinction is made clear to them . . . , there is no reason for them to credit the illustration any more than they credit the underlying opinion.[14]

After reviewing the animations presented to the Court before the hearing, and after viewing additional animations during the hearing, the Court finds that they are neither unduly prejudicial or misleading so as to warrant excluding their use during trial. The Court has already found Kennedy's opinion to be sufficiently reliable to permit him to testify, and therefore, Mathison's reliance on or use of Kennedy's conclusions in creating the animations was not improper. Belisle makes much argument about the light levels, sound level of the train horn, slope in ballast, and illuminated dwarf

---

[12]*Robinson v. Missouri Pacific R. Co.*, 16 F.3d 1083, 1088 (10th Cir. 1994) (citing 2 McCormick on Evidence 19 (4th ed. 1992)).

[13]*See id* (citing *Datskow v. Teledyne Cont'l Motors Aircraft Prods.*, 826 F. Supp. 677 (W.D.N.Y. 1993)).

[14]*Id.* at n.5 (quoting *Datskow*, 826 F. Supp. at 686).

signals that are part of the animations, but Belisle may address all of these points through a rigorous cross-examination of BNSF's expert regarding these animations. The *Daubert* inquiry does not require that these items be precisely accurate, merely that they be representative, which the Court finds that they are.

The Court was initially concerned over the misleading effect of the animations that excluded the position of the train on Main 1; however, BNSF has provided alternate animations that now show the train on Main 1, making Belisle's objection on that point moot. In addition, because BNSF's defense theory, at least in part, is that Belisle was to the west of the end of the train so that there would not have been a car to his left, animations that do not depict the train on Main 1 are not misrepresentative as to BNSF's theory of Belisle's possible location prior to being struck. The Court also finds a sufficient factual basis for BNSF placing Belisle past the end of the train on Main 1 based on proffered witness testimony to demonstrate its theory. We do not, however, find a sufficient basis for depicting Belisle with his hands over his ears standing immobile for upwards of twenty seconds. There is no real evidence that Belisle stood still for twenty seconds prior to the point of impact, nor is there evidence that suggests he held his hands to his ears that entire time. The evidence only supports placing Belisle in this position for upwards of seven seconds. The Court will not strike the animations based on this point; however, prior to their presentation, a representation must be made to the jury that there is no evidence as to what Belisle was doing at least until the last few seconds and that his depiction in those animations should not be taken as a representation of what he was doing up until those last seven seconds, or the timeframe the evidence establishes at trial.

With regard to the Top View animation, the Court has insufficient information to reach a decision, and we defer such ruling until the in limine conference currently set for May 5, 2010. In the meantime, the parties are directed to meet and confer as to the discrepancies identified in this hearing regarding this animation so as to be prepared to discuss the issues identified.

Because we otherwise find these animations to be illustrative of the expert's theory of the case, and will assist the jury in understanding that theory, we are not inclined to exclude them at this juncture. Therefore, Belisle's motion to exclude Mathison's opinion and the animations is denied.

### 3. BNSF's Motion to Exclude the Opinion Testimony of Jimmy C. Scott

BNSF moves to exclude the testimony of Jimmy C. Scott because his opinions and testimony are neither scientific nor technical, and thus, will not assist the jury. BNSF claims that Scott's expertise is grounded not on any scientific or technical based study, but on the less technical platform of "other specialized knowledge" based on his experience with another railroad, CSX. Relying on the Tenth Circuit's analysis in *United States v. Fredette*,[15] BNSF claims that Scott must explain how his experience allows him to reach his conclusions, why his experience is a sufficient basis for his opinion, and how his experience is reliably applied to the facts of this case. BNSF contends that Scott has explained none of this, and accordingly, the Court must exclude his testimony.

On March 26, 2010, the Court held a hearing pursuant to *Daubert* to determine the basis of Scott's experience as it relates to the specific opinions he reached in this case concerning safety and management issues for BNSF. During his testimony, Scott stated that his prior employer, CSX, and BNSF are both Class I railroads that are each governed by the same federal regulations. Scott also

---

[15] 315 F.3d 1235 (10th Cir. 2003).

testified as to his experience, which included supervisory and safety duties working with employees in close clearances, work as an actual brakeman, engineer, and conductor, working with end-of-train ("ETD") devices, working with carmen,[16] and familiarity with railroad safety rules, safety committees, and job briefing requirements imposed by federal law. Scott acknowledged that he himself had not worked in any engineering department with any railroad, nor has he worked in any mechanical department for CSX. He also testified that he has received no training as a mechanical engineer, and he was not qualified to testify on human behavior. Scott clarified that the basis for his opinions is the education, training, and experience he received as a front-line supervisor with CSX. He testified that he personally visited the scene of this incident to evaluate the working environment, and reviewed the deposition testimony of witnesses. Scott stated he then applied that training, education, and experience to the facts of this case to reach what he describes as a reliable opinion.

BNSF has moved to strike Scott's testimony in its entirety, which the Court is not inclined to do. After reviewing Scott's report and hearing his testimony, the Court is convinced that his experience would be an aid to the jury in understanding railroad operations, rules and regulations, some of the factual issues in this case, and understanding some of the procedures that occurred on the night in question. Scott testified that he keeps current in his area of expertise by reviewing rule books as they are amended, through his experience in various litigations, and through his membership in the International Railway Operating Officers Association and the Air Brake Association. Cognizant that Scott gained his experience with CSX a number of years ago, we are not persuaded that the fact that he himself has not worked in the area necessarily renders him

---

[16]Scott described a carman as an employee normally assigned to a specific railroad yard whose duties included inspecting railway cars, both inbound and outbound, for defects or other malfunctions needing repaired.

without a basis for his opinions.  Thus, the Court will not exclude his testimony on that basis.

While we do not exclude Scott's opinions in their entirety, numerous portions of his opinions cause the Court concern.  Therefore, as outlined below, where Scott expresses opinion for which he has no basis to express, where based on speculation, or instances where he makes what the Court finds conclusory statements made in a loaded or unnecessarily pejorative manner, those opinions are stricken and will not be permitted at trial.

First, BNSF raised concern over Scott's ability to testify as to SOFA rules, the blue flag, and the form B, all described in paragraph 1 of Scott's expert report.[17]  Based on Scott's testimony, the Court concludes that Scott has sufficient experience in the application of those rules and procedures to provide opinion relating to those topics.  However, Scott's statement that "[i]t is too easy to misjudge the invisible line between safety and death or terrible injury" is stricken as unnecessarily dramatic and because it is the type of pejorative statement that is improper for expert testimony.

Regarding paragraph 2 of Scott's report, Scott engages is a great deal of speculation, which is simply not appropriate for the type of testimony the he is going to be providing at trial.  The Court is aware that whether or not Belisle was told the train would be held will be a highly contested issue at trial.  Nevertheless, we find that there is at least a factual predicate supporting Belisle's theory of that issue upon which Scott may rely in expressing his opinion.  Therefore, the Court will not strike his opinion in that regard.  Scott may testify that his opinion relies on information that Belisle and his crew were allegedly told the train would be held, but he may not testify in a manner so as to over-dramatize the situation by stating that "[t]he ATM failed to properly carry out his job in . . . protecting Justin Belisle from *a train running over him* while he was installing the end of train

---

[17]*See* Doc. 145-8 (Scott Expert Report).

device,"[18] or by going into whether or not he believes assistant train master ("ATM") "Combs put his arm on conductor Ast [sic] shoulder."[19]  Statements of this nature are an unnecessary addition to an expert's opinion and will not be permitted.

Further down on page 3 of his report, Scott opines that "Mr. Belisle would have thought [the train] was coming down Main #2 or that it would have a crossover and come down Main #2."[20]  It is impossible to know what Belisle would have thought, and in fact, the parties stipulate that Belisle remembers no events from the night of the accident.  As a result, this type of opinion is based on nothing more than speculation, and will not be permitted.  Scott follows by opining that "[Belisle] would not have known whether he should run across Main #1 or whether the train was coming down Main #1 until it was too late."[21]  Again, Scott has no basis to know what Belisle thought or what Belisle knew or did not know at the time.  Therefore, these portions of Scott's opinion are stricken as speculative.

In paragraph 2 on page 3 of Scott's report, Scott first opines that "ATM Combs stopped performing his safety duties *when he stopped paying attention* to what the dispatcher was doing . . . ."[22]  This statement is speculative, and is stricken.  Scott then opines that "[t]he dispatcher either forgot or decided not to hold the east bound grain train like he told ATM Combs he would."[23]  That statement both speculates as to what the dispatcher was doing, and again, is unnecessarily dramatic.

---

[18]*Id.* at p.6 (p.2 of Scott Expert Report) (emphasis in original).

[19]*Id.* at 7 (p.3 of Scott Expert Report).

[20]*Id.*

[21]*Id.*

[22]*Id.* (emphasis added).

[23]*Id.*

Scott has provided no factual basis for knowing whether the dispatcher forgot or whether the dispatcher decided not to do something. Because this part of his opinion rests solely on speculation, it will not be permitted.

At the end of Opinion 2 on page 4 of his report, Scott states that "ATM Combs bears the brunt of Mr. Belisle's injuries because his plan changed in mid-stream . . . ."[24] This statement not only invades the province of the jury, but it is once again the type of pejorative statement that is improper for expert testimony. Accordingly, it is stricken.

On page 4 of his report in paragraph 3, Scott opines that the railroad failed to property train the ATM. Scott has provided no basis for knowing the ATM's level of training and has provided no foundation to demonstrate he has the requisite knowledge to testify as to the training requirements of an ATM. This part of his opinion is excluded. Directly after, Scott opines that "as expressed on the dispatchers tapes, ATM Combs had very little experience and it showed."[25] Scott may testify that Combs had been in his position for a short time, and in fact, the next sentence in his report testifies to that point, but stating that Combs had very little experience as a conclusory opinion and to state that "it showed" is an unnecessarily pejorative opinion that will not be allowed.

Scott further states that "[i]f you have others involved with their lives in your hands . . . ,"[26] then goes on to discuss keeping crews informed so that they are not put in harms way. The first part of this statement is unnecessarily dramatic and will not be allowed. The remainder of that statement, however, is an appropriate part of his opinion and will be permitted.

---

[24]*Id.* at p.8 (p.4 of Scott's Expert Report).

[25]*Id.*

[26]*Id.*

Scott follows in the same paragraph by stating "[i]f ATM Combs and the dispatcher had spent their time informing all involved of the life threatening changes they had made, instead of trashing another ATM, the incident at bar would have never happened."[27]  This statement is both speculative and pejorative and is inappropriate for this expert opinion, and it is excluded.  Similarly, Scott's statement, referring to another ATM, that "[a]s it turns out, Cats was right!" has no basis and is stricken as speculative.

Opinion 4, also on page 4 of Scott's report, states that "[t]he railroad had no good or safe chain of authority over the tracks at issue."[28]  There is no evidentiary basis for Scott to know what the chain of authority was, and there is no indication that he made any investigation to arrive at a factualization as to the chain of authority.  Therefore, because such statement is unnecessarily speculative, it is excluded.  The remainder of his sentence, "the ATM and dispatcher failed to properly coordinate and communicate about the work that was going to be done on Main 1 and Main 2"[29] will be permitted.

The next paragraph begins "A few minutes before the tragic, unnecessary incident involving Mr. Belisle, the dispatcher can be heard . . . ."[30]  While this statement is fairly introductory, it is also unduly loaded and unduly prejudicial.  Language from an expert containing such loaded, emotionally laden terms or conclusions, or other testimony at trial using such terms will not be tolerated, and the parties are cautioned to avoid using such unnecessarily loaded and pejorative

---

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

language at trial. These statements in Scott's written report are stricken.

Still in opinion 4, Scott opines that "[t]he dispatcher seen [sic] a need to tell the incident train crew about the local but did not see the same need to inform Belisle and crew of the fast approaching disaster."[31] This is again speculating as to the motivations of the dispatcher, and there is no evidentiary basis for such surmising. Therefore, this testimony will not be allowed.

On page 5 of Scott's report, still in opinion 4, Scott states that "[t]he dispatcher, when asked about what was involved in putting an EOT on a train during his resent [sic] deposition, did not have a clue what was involved."[32] The Court anticipates that the dispatcher will testify at trial. If so, Scott need not testify to what the dispatcher said. If the dispatcher does not testify, then Scott's recitation would nonetheless be hearsay and would be inappropriate for his testimony. Scott may rely on the dispatcher's opinions in forming his own opinion, but he cannot merely just relate their opinions to the jury. In addition, Scott's conclusory statement that the dispatcher "did not have a clue what was involved" is again the type of conclusory and loaded statement that will not be permitted at trial. Similarly, the following statement, "Quite the contrary; the dispatcher actually thought that all the work for the placement for an EOT was done at the rear end of the rear car of a train"[33] once again speculates to what the dispatcher thought. If the dispatcher chooses to testify as to his own thoughts from the stand, he may do so, but Scott may not speculate as to the dispatcher's thoughts. This statement is stricken.

---

[31]*Id.*

[32]*Id.* at p.9 (p.5 of Scott's Expert Report).

[33]*Id.* (emphasis in original).

Opinion 5 of page 5 of Scott's report contains similar conclusory and speculative statements. Scott begins by opining that "[t]he railroad put a premium on speed rather than safety at the Newton Yard."[34] There is no indication that Scott has examined railroad policy decisions, nor has he provided any other foundation for this opinion. Therefore, because there is no factual basis for such a conclusory opinion, it is stricken. Scott next states in his report that "[t]he railroad was using main #2 like a yard track so it could move trains faster."[35] While it may be true that BNSF was using Main 2 as a yard track, the last half of that sentence is, again, speculative, and thus, this sentence is stricken. The third sentence, "[t]he dispatcher hurried through his transfer and told the east bound grain train to hurry too" is conclusory as well and is beyond the appropriateness of what Scott is qualified to testify as an expert in this case. It is, therefore, stricken.

In the following paragraph, also on page 5 of his report, Scott states that "[a]ll the people involved, who have testified, has stated that it was very difficult to walk between main #1 and main #2 because of the main line large ballast rock, which creates a "V" shape between the two (2) mains."[36] If Scott has in fact walked that area of the track lines himself, and the Court assumes that he has, he may testify as to his own experience that it was difficult to walk on the ballast. He is not entitled, however, to represent what other people have said in this case for reasons already noted in this opinion. The sentence following relating to yard ballast and walkway ballast are an appropriate opinion for Scott to provide, and such will be permitted.

---

[34]*Id.*

[35]*Id.*

[36]*Id.*

Toward the bottom on page 5 of his report, Scott begins, "[a]fter giving the ill-fated train its instructions, the dispatcher is heard telling the east bound grain train that they needed to beat the transfer with the next dispatcher."[37]  Such testimony is unnecessarily dramatic for an expert's opinion.  If Scott desires to recite simply what the dispatch indicated, without dramatization or elaboration, then such testimony will be permitted.  Overdramatizing, however, is inappropriate and will not be allowed.

At the bottom of page 5 to page 6 of his report, Scott opines that "[h]ad the railroad taken the time to put its trains in the yard for the yard work to be done, Mr. Belisle never would have been next to main #1 when the grain train went by."[38]  While this might be true, it is partly speculative, and again, is the pejorative or unnecessarily dramatized language that will not be permitted by expert testimony.  Similarly, the following sentence, "[h]ad the dispatcher not been in such a hurry in his transfer, he probably would not have forgotten to hold the east bound grain train"[39] is also stricken for the previously noted reasons.

BNSF objected to Scott's reference to the railroad crews "self-dispatching" in Opinion 6, but this term appears to be one of Scott's invention that the Court finds is not unnecessarily pejorative or loaded.  Scott has identified the meaning of the term, and we will not exclude its reference. However, further down in his Opinion 6, Scott opines that "[i]n this case the only opportunity Mr. Belisle had to get any information that the dispatcher was not going to hold the east bound grain

---

[37]*Id.*

[38]*Id.* at pp.9-10 (pp.5-6 of Scott's Expert Report).

[39]*Id.* at p.10 (p.6 of Scott's Expert Report).

train was if he over heard it on the radio."[40] Scott provided no basis for this statement, and therefore, it is stricken as overly speculative and conjectural.

Opinion 7 of Scott's report presents more stylistic issues than substance. These issues relate to the use of unnecessarily dramatic language, such as "set a trap," "totally outrageous behavior," and "catch someone in the trap." Clearly, Scott is of the opinion that Belisle was put in an untenable situation that he should not have been place in. Scott is entitled to express that opinion based on his experience with the railroad but not in this dramatic style, as such would be unnecessarily prejudicial to the jury. Scott may not, however, specifically state in his testimony that the things he discussed in opinions 1-6 caused this incident, because such testimony would invade the province of the jury.

In Opinion 8, Scott opines that Belisle did not do anything wrong to cause the accident. Such an opinion is valid for Scott to give at trial, and BNSF may address its concerns on this opinion during cross-examination. However, Scott's opinion that "[Belisle] did not know if it was going to run into the rear of his train on main #2 or go by him on main #1 "[41] is purely speculative, as again, there is no basis for what Belisle knew at that time. It is appropriate for Scott to testify that Belisle was told at the briefing that the train would be held, as that is a disputed fact to which BNSF can cross-examine, but there is no basis to testify as to what Belisle or anyone else knew. Such testimony is speculative, and will not be permitted.

Similarly, Scott's opinion that "[a]t this point I doubt very much that Justin Belisle didn't know if he was looking at a runaway or the train was coming on main #2 . . ."[42] is speculative and

---

[40]*Id.*

[41]*Id.* at p.11 (p.7 of Scott's Expert Report).

[42]*Id.*

inappropriate in an expert's opinion and is stricken. In addition, Scott's opinion that "[i]t should be obvious to any reader of this description, that Justin Belisle thought he was in the clear!"[43] is again, speculative. This testimony will not be allowed. At the end of the paragraph, Scott states that "[t]his must have been because the engineer thought Mr. Belisle was in the clear."[44] This statement is obviously speculative and also will not be permitted.

With regard to Opinion 9 on page 7 of Scott's report, the Court concludes that the opinions provided are within the realm of Scott's expertise and are appropriate based on the facts of this case so as to permit this testimony.[45]

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Exclude the Opinion Testimony of William Kennedy and Brad Mathison (Doc. 264) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendant's Second Motion in Limine in which it seeks to exclude the testimony of Jimmy Scott (Doc. 144) is hereby GRANTED in part, and DENIED in part.

**IT IS FURTHER ORDERED** that Defendant's combined Motion to Redact Transcript of deposition of Jimmy C. Scott and Motion to Modify the Court's Order of March 26, 2010 (Doc. 390) is hereby GRANTED in part, and DENIED in part.

---

[43]*Id.*

[44]*Id.*

[45]In its combined Motion to Redact Transcript and Motion to Modify, BNSF moves to strike a number of other statements in Scott's expert report. For those statements identified in its motion but not specifically discussed in this Order, the motion is denied. The Court does not find the remaining statements or opinions inappropriate, and Scott will be permitted to testify to such at trial. BNSF makes not mention of redacting Scott's deposition transcript in its motion other than in the title; however, Belisle may not present any of Scott's deposition testimony to the jury that conflicts with this Order.

**IT IS SO ORDERED.**

Dated this 5th day of April, 2010, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE